IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JERRY E. BUTLER,

                  Plaintiff,                  OPINION AND ORDER

    v.                                                 20-cv-175-wmc

JIM ESCALANTE, GAIL SIMPSON,
and BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN,

                  Defendants.

*Pro se* plaintiff Jerry E. Butler claims that employees of the University of Wisconsin-Madison's School of Education discriminated against him based on his age and race in the hiring process for a Faculty Associate Position, then further retaliated against him for filing this lawsuit. Following his partial defeat of a motion to dismiss, plaintiff specifically is proceeding against defendants Jim Escalante and Gail Simpson for violating his Fourteenth Amendment equal protection rights and against the defendant Board of Regents of the University of Wisconsin System for violations of Title VII of the Civil Rights Act. (Dkt. ##24, 33.) Defendants later moved for summary judgment on all of Butler's claims (dkt. #36), which the court will grant.

UNDISPUTED FACTS[1]

**A. Background**

Butler is an African American artist and educator who holds a Master of Fine Arts degree, a Master of Arts in Landscape Architecture, and a Doctorate in Curriculum Design, as well as a Wisconsin teaching license in art. As noted, he is proceeding against the University of Wisconsin System's Board of Regents and two of its faculty members. Defendants Escalante and Simpson were both professors in the UW-Madison Art Department, and Escalante also served as its Associate Dean in the School of Education.

**B. Butler's Application for the Faculty Associate Position**

In April of 2014, the Art Department began the recruitment process for a faculty associate position in art education at UW-Madison. The position was not tenure track, but it was a full-time, year-round position. The person hired would be responsible for all aspects of the art education teacher certification program, including "forg[ing] positive relationships with local school districts and teachers," while also carrying a 12-credit load per semester of "classroom instruction, and supervision of student teacher placements." (Dkt. #42-1 at 1.)

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence of record as appropriate. Butler purports to dispute many of defendants' proposed findings of fact, largely with qualifying language or arguments (*e.g.*, dkt. #46 at ¶¶ 6, 10), which the court generally overrules as immaterial except as addressed in the opinion section below with reference to Butler's opposition to defendants' motion.

The posted position required a Master of Arts degree and at least three years of teaching experience in PK-12 classrooms or equivalent settings. The position vacancy listing indicated that a Master of Fine Arts or a doctoral degree was preferred, as was a Wisconsin public school teaching license, while an "[i]nterest and experience with community-based outreach and education [was] a plus." (*Id.*) Applicants also had to submit a cover letter and contact information for three references, as well as their teaching philosophy, a resume, degree transcripts, and examples of their art education course syllabi. Additional letters of reference that addressed an applicant's teaching ability in PK-12 classrooms or in a university setting were also "desirable." (*Id.* at 2.) Finally, the vacancy listing indicated that the University "is an equal opportunity/affirmative action employer" and "promote[s] excellence through diversity and encourage[s] all qualified individuals to apply." (*Id.*)

At approximately 68 years of age, Butler applied for the position. His application materials included a three-page letter describing his qualifications, interest in the position, and experience working as a professional artist and educator; it also included the names of schools and organizations that had employed him. (Dkt. #42-3 at 1-3.) He further submitted a description of his teaching philosophy, a syllabus from a university art education course, transcripts, a copy of his Wisconsin teaching license, letters in support of his renewal and tenure at a Connecticut university, peer observation reports of classes Butler taught, and student journal entries about the first day of Butler's class. Finally, while Butler's resume did not list his employment history, it did list his degrees,

publications, "Mentions in Media," exhibitions, public art projects, board experience, awards, references, and links to his website with online examples of his work. (*Id.* at 5.)

### C. Evaluation of Applications

Escalante and Simpson, along with a non-defendant, Barbara Gerloff, comprised the search committee charged with evaluating applications and hiring for the position at issue. Both Simpson and Escalante had served on numerous search committees and reviewed hundreds of applications in the past. Twelve individuals, including Butler, applied for the position. As committee chair, Simpson directed committee members to review the applications and rank them, with the intention of comparing their top five applicants and reaching a consensus regarding the top three, or possibly more, to interview. Simpson explains that the committee was looking for a candidate "who could rebuild and guide the [K-12] certification program through" a recent change in state licensing regulation, and "who would strengthen relationships with local school districts and within the [Art] Department." (Dkt. #42 at ¶¶ 19-20.)

The search committee members first reviewed the applicants' materials individually. Escalante and Simpson had previously met Butler when he was a student at the university, and Escalante had visited him when he was a department chair at Madison Area Technical College. As a consequence, both defendants were aware of Butler's race and sex, as well as had a sense of his approximate age. However, there was no discussion among the search committee members regarding any applicant's race, color, sex, or age.

Defendants Escalante and Simpson also exchanged emails about the applicants. Escalante sent Simpson an email on May 27, 2014, generally noting that there was "[a]n

4

interesting range" of applicants with "a wide range of years of service." (Dkt. #41-1 at 1.) Although indicating that he had "met and had some connections with Jerry Butler," Escalante noted that then-graduate student Felice Amato was "wonderful" and "experienced," had a "great ability to manage different types of activities," and "bridges art education for K-12 and some of the other art education that we have envision[ed] building into the program." (*Id.*) Butler further noted that Amato did not have a Master of Art degree at the time, as required for the position. However, Amato stated in her cover letter that she would complete the degree that year, and she already had a Master of Science degree in curriculum and instruction, three K-12 certifications, and had taught K-12 Spanish and art in public schools for 22 years. In a follow-up email sent later that day, Escalante notes that while Butler "has a long list of accomplishments," it seemed "odd that he did not list any previous employer on his cv," while the other "viable candidates did list them." (*Id.* at 2.) Simpson's responses did not reference Butler at all. In fact, none of the three committee members, including non-defendant Gerloff, selected Butler to interview for the position.

Ultimately, the committee interviewed six people, while Amato was among them, she was not hired. The committee hired Mary Hoefferle, who was in a tenure-track, faculty position in the art department at UW Oshkosh, familiar with the state's recent licensing regulation changes, and currently supervising art education majors in clinical and student teaching placements. In her resume, Hoefferle also included a section dedicated to her teaching experience, as well as provided a reference letter that spoke to her leadership in improving professional development offerings for K-12 teachers. (Dkt. #42-8 at 140-41,

166-67.) Amato also provided a detailed overview of her K-12 experience in her cover letter, as well as a detailed chronology of her employment in her resume and references who could speak to her experience in her K-12 jobs. (*See id.* at 172-73, 174, 183.) Similarly, each of the other four finalists selected described their K-12 teaching experience in their cover letters and included employment history in their resumes. All but one of the six also provided references that could speak to their K-12 experience. (*See id.* at 211-92.)

All three committee members further attest that Butler's application materials were not easy to evaluate, although Butler disputes this characterization as "pretextual." In particular, Escalante attests that he considered the applications "solely on the basis of their clarity and the applicants' abilities to perform well in the [p]osition." (Dkt. #41 at ¶ 33.) He also recalls that Butler's cover letter "failed to discuss his qualifications relevant for the advertised position" as it seemed tailored to an Assistant Professor, tenure-track vacancy, "which has a different set of duties and expectations." (*Id.* at ¶ 28.) Further, Escalante notes that Butler's resume did not include "basic pertinent information such as listing previous employers," and he submitted materials that did not speak to "experiences with K-12 schools," such as classroom observation reports; instead, he provided a letter supporting his promotion and tenure at a Connecticut university. (*Id.* at ¶¶ 29, 31.) Moreover, Escalante explains that the chosen candidate would have to ensure from the beginning that the certification program met all Wisconsin required program mandates, and Hoefferle had already developed courses in the art education program at UW Oshkosh to ensure that her students met all licensing requirements, plus she had experience preparing her students for the licensing exam.

Simpson and non-defendant Gerloff similarly attest that Butler's application materials were difficult to evaluate in comparison to those of the other applicants. Simpson recalls that Butler's materials were "poorly organized and difficult to follow." (Dkt. #42 at ¶ 28.) In particular, Simpson recalls Butler's resume "stood out from other applicants because [it] did not contain a portion devoted to job or work history," while the other applicants' resumes did. (*Id.* at ¶ 26.) Simpson also found that Butler "used vague terms" without explanation, such as "describing himself as having 13 years art administration experience." (*Id.* at ¶ 27.) This made it "difficult" for Simpson at least "to effectively evaluate Dr. Butler's qualifications for the position" in contrast to other candidates' materials that "made it very easy for [Simpson] to evaluate relevant skills and work history." (*Id.* at ¶ 26.) Indeed, based on how he presented himself in his materials, Simpson concluded that Butler was not the most qualified applicant for the position, while Hoefferle had experience "aligning the training of students with the new curricular guidelines" set forth by the state. (*Id.* at ¶ 37.)

As for the third member of the search committee, non-defendant Gerloff had no previous knowledge about Butler. Yet Gerloff also attests that Butler's materials were "difficult for [her] to follow," in particular because his cover letter referenced various employment experiences, but his resume did not include additional or more specific information about his actual employment history. (Dkt. #40 at ¶ 22.) For example, while Butler wrote generally that he had over 15 years of K-12 teaching experience in Madison schools, Gerloff found none of the necessary information to understand his employment history or his duties in the other materials that he provided. Gerloff found these

7

"omissions" to be "puzzling," while Butler's materials overall failed to make the case that he had the relevant experience for the position. (Dkt. #40 at ¶ 27.) Meanwhile, Gerloff's impression was that Hoefferle understood current issues in art education and was "well acquainted with [the] new, high stakes certification requirement and had designed her class(es) with these requirements in mind." (*Id.* at ¶ 22.)

Finally, it is undisputed that on May 28, 2014, Simpson and Gerloff met to discuss the candidates and agreed on six applicants to move forward to a phone interview, while excluding Butler. Following that decision, Simpson emailed Escalante for his opinion, and he agreed with the choices, noting that they all had "good K-12 experience." (Dkt. #41-1 at 3.) The committee then interviewed the finalists over the phone before selecting three candidates for in-person interviews, eventually hiring Hoefferle.

Butler filed a complaint with the EEOC on October 10, 2014, that was later dismissed. He also sought relief from the Wisconsin Labor and Industry Review Commission. About a month before Butler filed this lawsuit in February of 2020, he applied for a drawing and painting position in the art department but was not hired, which he now claims was driven by retaliation for complaining about not being hired in 2014.

OPINION

A party is entitled to summary judgment if they show (1) no genuine dispute exists as to any material fact, and (2) judgment is appropriate as a matter of law. Federal Rule of Civil Procedure 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. If the moving party makes a showing that the undisputed evidence establishes

8

their entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252). Here, defendants persuasively argue that they are entitled to summary judgment on the merits of all of plaintiff's claims.

### I. Plaintiff's retaliation claim

The court begins with plaintiff's retaliation claim, which requires the least discussion. Plaintiff contends that the art department did not hire him for a drawing and painting position in 2020 in retaliation for filing his previous administrative complaints and this lawsuit. To prevail on this claim against the Board of Regents under Title VII, plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (quoting *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)).

As an initial matter, plaintiff has effectively abandoned this claim by making no argument in support of it in his opposition brief. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (a plaintiff abandons a claim by failing to respond to arguments against it in an opponent's motion for summary judgment). Regardless, this claim also fails on the merits. Although plaintiff applied for the position about a month before he filed this lawsuit, the Seventh Circuit has explained that "[s]uspicious timing may be just that – suspicious – and a suspicion is not enough to get

past a motion for summary judgment." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

Specifically, for plaintiff to proceed to trial, he would have needed to "show that the person who decided to impose the adverse action knew of the protected conduct." *Lalvani v. Cook Cnty., Illinois*, 269 F.3d 785, 790 (7th Cir. 2001) (citations omitted). While plaintiff was not hired, he has failed to produce *any* evidence of who made the hiring decision for the drawing and painting position in 2020, let alone that they were aware of his earlier complaint or this lawsuit *or* relied on it in denying him the position. Accordingly, the court must dismiss plaintiff's retaliation claim against the Board of Regents.

## II. Plaintiff's racial and age discrimination claims

Because Escalante and Simpson were aware that plaintiff was African American and approximately 68 years old when he applied for the Faculty Associate position, he contends their decision not to hire him was based on his race and his age in violation of his equal protection rights. He bases his separate Title VII claim against the Board of Regents on this same, alleged racial discrimination. *See Smith v. Bray*, 681 F.3d 888, 895-86 (7th Cir. 2012) (Title VII "authorizes suit only against the employer as an entity").

Relevant here, Title VII prohibits employers from refusing to hire someone because of their membership in certain protected categories, including race, and the Equal Protection Clause prohibits intentional discrimination based on race and age, among other categories. *De Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). Moreover, courts "evaluate discrimination claims brought under both Title VII and § 1983 using the

10

same standard." *Id.*; *see also Smith*, 681 F.3d at 899 ("In general, the same standards govern intentional discrimination claims under Title VII, § 1981, and § 1983").

In a disparate treatment case like this one, plaintiff must show discriminatory intent. *Williams v. Seniff*, 342 F.3d 774, 788 n.3 (7th Cir. 2003). However, in deciding which candidates should advance, the court can find no evidence that defendants even discussed plaintiff's race or age, nor the race or age of any other candidates.[2] Of course, plaintiff may still rely on the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), "which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Dunlevy v. Langfelder*, 52 F.4th 349, 353-55; *see also Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 926 (7th Cir. 2007) (the burden shifting method applies to Title VII claims against employers and equal protection claims against individual employees).

To establish a prima facie case of discrimination, plaintiff must show that: (1) he is a member of a protected class; (2) he applied and was qualified for a position; (3) but not hired; (4) while a similarly situated applicant outside of the protected class was hired

---

[2] Plaintiff argues that defendants' comments about a candidate's recent high school or K-12 teaching or graduation from a Wisconsin higher education institution in reviewing the applicants are references to age. (Dkt. #43 at 10.) However, he does not explain how recent completion of a college degree in Wisconsin or K-12 teaching, or any kind of recent teaching experience, *necessarily* correlates to age. Indeed, defendants' discussion of such credentials and experience was necessary and relevant to the position because it called for someone to oversee the teacher certification program based on new standards, as well as someone who could build relationships with local school districts and teachers.

instead. *Sweatt v. Union Pacific R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015). Still, the ultimate question remains whether plaintiff has presented sufficient evidence, taken as a whole, from which a reasonable finder of fact could conclude that defendants discriminated against him because of his race and age. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

In applying the *McDonnell Douglas* framework, the parties' dispute centers mainly on whether plaintiff was "similarly situated" and whether defendants' stated reasons for their decisions were a mere front for discrimination. To begin, similarly situated comparators "must be prima facie identical in all relevant respects." *Reinebold v. Bruce*, 18 F.4th 922, 926 (7th Cir. 2021) (citation omitted). In other words, a comparator "is one whose performance, qualifications, and conduct are comparable in all material aspects." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463 (7th Cir. 2014). Plaintiff's arguments with respect to even this prima facie requirement are murky at best. Throughout his response brief, he generally asserts that: he was the most qualified applicant; he was the only candidate to show "accomplishment" as an art educator; and "no other candidate comes close to [his] level of community engagement on a local or national level." (Dkt. #43 at 4, 5, 8, 12.) Specifically, as for Hoefferle, plaintiff simply opines that she is "less qualified" and lacked the required master's degree. (*Id.* at 17.) However, plaintiff ignores that Hoefferle has a doctorate in art education, which was a *preferred* degree. (Dkt. #42-8 at 140.)

Unlike plaintiff, Hoefferle was also already working in the University of Wisconsin system overseeing art education majors and working with local school districts. Moreover,

12

she demonstrated her understanding of the certification process for teachers in the state, including the newly added requirements. In contrast, plaintiff's submissions on these subjects left all three committee members confused and wanting more. Thus, plaintiff has wholly failed to establish that Hoefferle was "less qualified" for the position, or that they were similarly situated in all material aspects.

Indeed, with respect to both the similarly situated requirement and evaluation of the legitimate reasons for the committee's decision plaintiff's application materials make it difficult to compare *any* of the other, chosen candidates' ability to meet the needs of the position. While plaintiff *contends* that defendants are being disingenuous because his materials show how his experience meets the listed requirements of the posted vacancy listing, to demonstrate that defendants' stated reasons for *not* interviewing or hiring him were pretextual, he must establish that those reasons are dishonest, not just mistaken or unfair. *See Collins v. American Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013) (the question is not whether the employer's stated reason was inaccurate or unfair, but whether it was a lie). Since he has not begun to meet his burden, his discrimination claims cannot proceed even if he could establish a prima facie case.

In particular, plaintiff asserts that the court previously found that his cover letter was detailed and included the names of organizations and schools that had employed him in refutation of defendants' characterization of his cover letter being vague. (*See* dkt. #24 at 2.) However, plaintiff merely cites the court's "Allegations of Fact" section in its opinion and order rejecting defendants' motion to dismiss in part. Obviously, the court's recitation of the facts *alleged* by plaintiff are neither finding of fact nor evidence of pretext. *See Roberts*

13

*v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016) (at the motion to dismiss stage, courts accept all well-pleaded facts as true and draw reasonable inferences in plaintiff's favor).

In fairness, plaintiff's cover letter references potentially relevant professional experience. For example, plaintiff references his "positive relationships with school districts, cities, and states," that he has "more than 15 years of experience as a K-12 art educator" and taught in a Wisconsin school district as "a student-teacher supervisor," as well as developed recruitment materials and strategies for a Connecticut Master of Science in Art Education Program. (Dkt. #42-3.) Thus, defendant Escalante noted positively in reviewing plaintiff's submission that plaintiff "has a long list of accomplishments" and a connection to the University of Wisconsin's program. (Dkt. #41-1 at 1-2.) However, without corresponding information in his resume compared to the other candidates -- including specific duties and dates of employment -- defendants were left to puzzle out for themselves *how* plaintiff's experience would fit the duties of the position they were seeking to fill, especially with respect to the other candidates' experience directing a teacher certification program and preparing students for the new licensing requirements.

Plaintiff also points to his reference letters as "adding depth, and color to [his] work history experiences in the K-12 and university classrooms," and takes issue with defendant Escalante's comment that he found it "odd" that plaintiff included them when the vacancy posting *solicited* letters addressing an applicant's K-12 or university teaching experience. (Dkt. #43 at 10-11.) Again, however, unlike most of the other interviewed candidates, plaintiff's letters were *not* for positions comparable to that for which plaintiff was applying,

14

and shed little light on the committee's question as it relates to that position. (Dkt. #43 at 10-11.)

Plaintiff's other arguments are similarly unavailing. In his response brief, plaintiff characterizes the posting of the vacant position as "binding" and a "contract" that defendants "breached." (Dkt. #43 at 2, 8.) For example, plaintiff argues that Amato should not have been interviewed because she lacked a *completed* Master of Arts degree when she applied, even though she was about to complete the degree and had a Master of Science degree in curriculum and instruction, and despite all of her other, relevant experience. He also contends that the committee should not have considered images of applicants' creative and student work (to the extent the members did) when the vacancy listing did not ask for such submissions, even though the position was for an art educator and the posting expressly noted that an interest and experience with community-based outreach was "a plus." (Dkt. #42-1 at 1.) Regardless, plaintiff cites no legal authority for the proposition that a search committee has no flexibility in interpreting and prioritizing the position requirements and description, nor is the court award of any.[3]

Plaintiff would also take issue with other attestations by Escalante. In response to Escalante's statement in his declaration that plaintiff did not provide any current references, as well as non-defendant Gerloff's similar observation that plaintiff did not

---

[3] Moreover, the court already rejected plaintiff's attempt to add a state-law breach of contract claim to this case based on his view of the position listing as a contract with applicants. (Dkt. #33 at 2.) Nor will the court allow plaintiff to renew that essentially meritless claim now via his opposition brief at summary judgment. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023) (a district court has the discretion to treat new claims presented for the first time in briefing as a constructive motion to amend, but it will rarely be appropriate to do so).

provide references from anyone in a PK-12 school, plaintiff notes that he included three reference contacts on his resume from colleagues at his then-current university (dkt. #42-3 at 8), and that one of his reference letters discusses plaintiff's participation in a community art project involving elementary students. However, that reference to a community project is not the same as a reference contact who actually *worked with* a candidate in a PK-12 school. And while Escalante may have been mistaken as to whether plaintiff had included reference contacts from his current employer, that is not enough for a reasonable jury to infer that he intentionally misrepresented why he did not hire plaintiff. *See Collins*, 715 F.3d at 1000 (the question is not whether the employer's stated reason was inaccurate or unfair, but whether it was a lie). Finally, plaintiff disputes Escalante's impression of his application materials as tailored for a tenure track faculty position. However, as noted above, plaintiff actually included a reference letter in support of his tenure promotion, and his cover letter speaks more generally about his experience in art and teaching, as opposed to addressing how his experience meets the specific needs of the position. At bottom, plaintiff has simply not shown that the committee's hiring priorities were not legitimate.

In the end, therefore, no reasonable jury could conclude on this record that defendants were dishonest about the problems they perceived with plaintiff's application materials, much less infer that plaintiff's race or age was a reason for favoring another candidate. Instead, the evidence shows that defendants reasonably weighed relevant experience, rather than simply crediting a candidate's overall experience in the fields of art and art education. Certainly, plaintiff is accomplished in these general fields, but his

subjective belief about the relative strength of his candidacy for the position at issue in this case is insufficient for a reasonable jury to reject defendants' specific examples of deficiencies in his application materials as pretext. *See Balderson v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d 309, 323 (7th Cir. 2003) (plaintiff's "own belief that he was the best candidate is irrelevant to the question of pretext").

Because no reasonable jury could find that defendants declined to hire plaintiff based on his race or age, his discrimination claims must also be dismissed.[4]

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #36) is GRANTED.

2) Defendants' motion to stay pre-trial filings and trial (dkt. #47) is DENIED as moot.

3) The clerk's office is directed to enter final judgment for defendants.

Entered this 3rd day of October, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[4] Even if otherwise meritorious, plaintiff's official capacity claim seeking injunctive relief against Escalante in the form of instatement to a faculty position at the university also fails because he provides no basis for providing such extraordinary relief. (Dkt. #24 at 7 n.5.)